Mr. Ayer, is it? Yes, it is, Your Honor. Did I pronounce that right? Well, long story, but yes. Oh, well. You tell me if it's wrong. It is right now. Well, what do you call yourself? Michigan is the only... I'm calling myself Ayer. Ayer, all right. And your co-counsel is also an Ayer?       All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. All right. I'm tempted to let him have rebuttal. Well, you've reserved three minutes for rebuttal. We'll see how it goes. You may proceed. Well, good morning, Your Honors, and if it pleases the Court, Douglas Ayer, on behalf of McAlpine PC, on behalf of Appellate Mass, the LLC. Thank you very much for allowing my son, Blaine, to sit at counsel table with me. He's promised not to start flipping that bottle, but I've given him. If you have grandkids or children that age, you may have seen him do that a lot. Contractual notice provisions can be unenforceable for unreasonable delay or uncontemplated delay. The record includes SKK's white paper record 75-1, titled Why the Bridge is Late, where SKK blames substantial delays on the incomplete designs of the project. That is evidence of an uncontemplated delay. Stage four was delayed two years. That is evidence of an unreasonable delay. SKK. New York State has recognized delays even longer than this one as being nonetheless covered by no delay clause, right, no damages for delay clause. They have in some situations, and they've also recognized delays of two years or less of being an unreasonable delay, and that gets to the core point of this, is this becomes an issue of fact for a jury to decide whether in this situation that would be an unreasonable under these circumstances. The other main issue is SKK had told the Port Authority initially when they were talking about and discussing the cost increased on stage four, that NASD's cost increased 5 million, and then they revised that to 4 million when they were presenting this to the Port Authority under all the provisions of the False Claim Act and the requirements on SKK presenting these claims to the Port Authority. After SKK learned that the Port Authority would pay at a lump sum of 325 million and allow SKK to apportion those funds to the subcontractors, SKK revised NASD's delay increases to actually a credit in favor of SKK, despite labor costs increasing during that period. Following termination, SKK further reduced NASD's- So you're, are you also arguing the good faith exception? Yes, I am also arguing the good faith exception, particularly as it applies to the ultimate termination under the contract, because- And so, what's the evidence of bad faith or the lack of good faith? I think- Change what you've just pointed out? I think that's the primary evidence. The record reflects that initially, SKK was presenting this as 5 to $4 million in increased cost for- So the district court says there's nothing to indicate that it's bad faith other than the drop in amount. I mean, is there anything other than the drop in amount, the difference in amount, to suggest bad faith? I think that is exactly right. It is the drop in amount over the course of time and the circumstances of how it's being presented. But it's, I mean, SKK sent a letter that sort of goes through, you know, bit by bit, the aspects of the request, and then carves them down for things like, I mean, the substantial part of this was with respect to winter work, winter work conditions, right? Yes, your honor. And I didn't see anything in the record to challenge those findings. Well, and that's where I say, that becomes an issue for the jury to look at both of these issues. But wait, is there anything in the record that challenges the calculations of SKK on winter conditions or the scrap steel prices or anything else? Not on a line by line basis as a rebuttal to that letter specifically, but following termination, SKK reduced the contract price or contract balance owed to NASD or for NASD's contract that wasn't completed by NASD from 16.4 million to 13.5. But then, after termination, spent well over $40 million completing that work, indicating as a factual possibility for a jury to decide that the work really could not have been completed for the price that SKK said in that letter to- But it's your burden to show bad faith, right? Yes. It is our- All you've got is that the number dropped from 4 million to, I guess, a reversal of a net 700,000 going the other way, right? Yes, they reduced it $5 million, but then spent well over that. They ended up spending three times the contract balance to complete the work. If there could be any number of reasons that the costs escalated over time as the construction started again. I mean, I'm not sure that that shows that at the time of their change of their decision here, their alleged breach of contract, that they're acting in bad faith. I can't argue that there are explanations that would be in favor of SKK's position. I think, ultimately, there is sufficient evidence for a jury to find that there had been bad faith on the termination and that there had been unreasonable and uncontemplated delays. And are you claiming, if you could clarify just, you claim that the district court was wrong in dismissing the breach of contract, the quantum merowit, the abandonment claims, and the breach of the covenant of good faith and fair dealing. That on all of those counts, there was error, is that right? Yes, that is correct, your honor. And the breach of contract, so that is related to the delay that that was- Can be within the contemplation of the parties, that this one was unreasonable. And what's your strongest case for saying that this was unreasonable? This is a very kind of fact-laden determination, and the district court looked at all the facts and the nature of the project. I mean, the project was years and years long. So it seemed to me, while the two years was lengthy, that doesn't in itself show that this was outside the contemplation of the parties. Particularly because this was a prime contract as to, you were in a subcontract as to which the prime was in the control of the port authority. So that also suggested to me that the district court was likely correct, that this was within the contemplation, even if it was an unreasonable delay. Why is that incorrect? And that's why I think I cited the first thing to the white paper. Because the white paper, SKK, told the port authority that these are the reasons why there are delays. And it's the incomplete plans from the port authority. But the fact that there was negligent planning or poor action on part of the port authority doesn't mean that this was outside the contemplation of the parties in terms of the kind of delay and the length of delay. I don't think the white paper gets you where you need to go. It is the best evidence that we have on the issue, your honor. And I understand the positions and the questioning of the court, and I understand the position of the district court. And I see my time is, I think, is that elapsed, if I'm reading that correctly? But let me finish this point up. It very well is the best evidence we have on the issue. But I think it points very clearly to an issue that the jury should decide rather than the district court. All right, thank you.  So we'll now hear from Mr. Bell on behalf of SKK. Good morning, your honors, and may it please the court. Robert Bell of Picard and Abramson for SKK. Through this appeal, Appellant Nosdy is seeking to rehash arguments twice rejected in detailed opinions by Judge Cote. Well, it's not been, I guess, twice rejected. It's not fully developed, I suppose, is the problem. Is it, in your view, fatal that there's no attempt to refute the February 17th letter that lays out each of the reasons that SKK concluded that there was actually a $700,000 net going the other way? Absolutely. The evidence shows that SKK worked in good faith to take a look at the claims that Nosdy was putting forward, take a look at the various issues related to those claims, such as winter conditions, such as labor costs, inflation costs, scrap metal costs, and go line by line through each of those categories, set forth SKK's position with respect to each of those categories of costs, and then come to an ultimate conclusion. It's important to keep in mind that at the time that- It seems to me that the issues of good faith, whether the delay was contemplated or uncontemplated, they are inherently factual questions. Doesn't the record contain a fair amount of evidence of uncontemplated delay? I mean, for example, two year delay. Some cases say it's okay, or it doesn't fit within the exception. Others say the opposite. So you'd have to look at the circumstances. SKK says there was a cardinal change, a plethora of significant issues. There's the drop from the internal evaluation to much lower. Why couldn't a jury find on the basis of these circumstances that there was either uncontemplated delay or bad faith? So first, thank you for the question. First, there was no evidence put forth of bad faith, number one. Number two, other than the- What I just identified is circumstantial evidence. I mean, how do you prove bad faith? But you look at, you don't know what's inside someone's head, but you look at the circumstances. Couldn't a jury determine from these circumstances taken together that there was bad faith? That they were, that SKK really knew it was going to cost a lot more and they were going to really low ball it because to take advantage of the no damages for delay clause. Yeah, I think that looking at all of the evidence together, there would not be a issue of fact for the jury. In particular, looking at complex public works contracts such as these involving multi-parties, including parties such as the Port Authority. Delay is something that is very much contemplated by the parties. In fact, the contract itself has multiple provisions related to potential delays. But at some point it would become unreasonable, right? Would go outside the contemplation of the parties. The no damages for delay clause isn't a get out of jail free card for a decade delay that has no basis in fact, right? Absolutely, I mean, it's not unlimited. We would certainly agree with that, but the amount of delay here, which was less than two years, is very much consistent with and similar to the case law in New York State with respect to a no damages for delay clause. But why, following up on Judge Chin's question, why isn't that a question for the jury to determine? Because looking at the case law and looking at the fact that all we are dealing with is the delay itself. There's no other evidence related to this being unexpected or uncontemplated by the parties. In fact, the parties very much in the contract contemplate that there are going to be delays. There could be delays. Sections five, six, and seven of the contract. What about the SKK's comments that this is a cardinal change? Doesn't that suggest that this is uncontemplated? It created a plethora of significant issues that have resulted in substantial increase in construction costs and schedule delays. I mean, couldn't a jury hear that and say, yeah, maybe this is uncontemplated delay? I think looking at the totality of the evidence that that is not sufficient to find for, to allow this to go to a jury, the evidence shows that the parties very much contemplated delay. The parties were working for a period of time in terms of setting a schedule for the- The original contract price was like 21 million? About 21 million. And what was it in the end to cover Nasty's work? I believe it was over 40, it was over 45, I believe. Does that sound like it's uncontemplated if it's double the original contract price? Or at least some evidence thereof? It is, I would agree that it is evidence. I do not think that it is sufficient to show that it was uncontemplated, particularly given that the contract explicitly contemplated that there would be delays, that there could be delays, and that there were mechanisms in the contract for providing for the costs related to those delays. Do we apply a special kind of understanding of contemplated delays in the context of a prime contract? That this is a sub two, that is that there's a third party who's not within the control of neither party that would be in charge of phase three. Do we look at it a little bit differently in that context? Absolutely, because particularly that this is a public works contract, this involves the port authority over which neither SKK nor Nasty has any control. There are also other moving parts. This is the Bayonne Bridge Raise the Bridge project. This was a massive project, raising the top deck lower and removing the lower deck so that the large ships could pass underneath. Massive public works project. And it does seem that in massive public works projects, delays and changes are going to be entirely outside of the control of the parties like SKK and Nasty. And what about the extenuated circumstances that Nasty seemed to find itself in? I mean, ultimately, for bankruptcy, I think, right? I believe that's my understanding. Yeah. And the costs that were incurred, as Ed Sheeran has pointed out, were ultimately a whole lot more than it would have taken for Nasty to get some accommodation up front, which seemed to be designed to sustain them. Is that no indication of the absence of good faith and fair dealing that SKK made really no accommodation? SKK was at that time, there was no basis. Well, there are two things that were happening at the time when Nasty walked off the job. Number one, they were demanding the upfront payment. There was no mechanism in the contract for such an upfront payment for stage four work. At the same time, there was the delay claim that was pending with respect to the port authority and the global settlement of claims. That was very much in the works. That was not a done deal at the time that they refused to mobilize for stage four of the project. That discussion was ongoing when they decided not to mobilize. Had they continued to do the work and then put in the claims through the claim process and allowed the negotiations to continue with respect to the delay claim with port authority, maybe the situation might have been different. Thank you very much. OK, thank you. We'll hear from Mr. Ayer for three minutes of rebuttal. Thank you, your honors. My esteemed co-counsel suggested that I mentioned that the public work project was part of the post-recession federal funding for shovel-ready projects. Unfortunately, he doesn't have a site to the record for that right now. But that, I think, is an important part to consider as part of the evidence for whether or not this was an uncontemplated delay. These projects coming out of the recession and the federal funding for large public work projects were supposed to be shovel-ready projects that were supposed to be able to start immediately. But the contract had built in a process by which delay, there could be payment in the event of delays, right? It did have that, your honor. Yes, it does. Why didn't NASTY take advantage of Section 7? I can't answer intelligently why action wasn't taken earlier on the project. This was a project that NASTY had purchased, or actually the owners of NASTY purchased NASTY after this contract was assigned. So they weren't involved at the very beginning of the project, the current owners. Other point is that following termination, SKK had hired the same contractor whose full name I can't recall, that's listed on their counterclaim cost worksheet as ACD. I believe ACD and a joint venture with a company whose initials were EIG was proposed prior to termination as a subcontractor to NASTY to do the work for $25 million. And SKK would not approve that. Following termination, they turn around, assign part of the work to that entity for which they charge $22 million with the wire saw credit of 2.64 million, which if I read this correctly, meant that it would have been essentially the same amount that NASTY was proposing to hire this company and subcontract prior to termination. The same amount except the now wire credit was assigned, and then SKK billed another $20-some million on top of that post-termination. Absent any questions, that's all we have. All right, thank you very much, Mr. Ayer. Thank you. And thank you again for allowing my son to sit up. No, that's all right. He was well-behaved. Great. All right. We will reserve decision.